Please the court, your honors, I am Thor Hearn and I represent six Arizona ranch families whose claim was dismissed by the lower court Judge Hodges. For five of these ranchers the primary issue is whether or not Judge Hodges was correct to dismiss their claims after remand by concluding that the limitations period under section 2501 commences running on a newly found but older notice of infantrail use that no one knew about for 13 years almost after it was issued. But wasn't that settled in Caldwell that when the NITU issues is the key date and this was a public record? Well I would address that two points. The second point being the public record is the key point. Absolutely it's settled law of the circuit that the taking in a Trails Act case accrues and the owner has the right to commence an action for compensation upon the issuance of the original NITU. Settled law we in no way dispute that. That's well settled now with Caldwell, Barkley, Illig, re-hearings and re-hearing in this case itself. So that is not what we see the issue Your Honor. Rather it is a question when the owner doesn't know of it, has no knowledge of it and you mentioned public proceeding. The NITU is not published in the Federal Register. There is no notice provided to the owner. In this case ten different lawyers from the Justice Department all the way through three years of discovery including an appeal to this court, two different Assistant United States Attorney Generals, two different Surface Transportation Board General Counsel and the Commissioner of the Surface Transportation Board Office of Proceedings all concluded that the original NITU, the first NITU was the one in 2006. It was the subject of the litigation. And now Caldwell and Barkley, they both involved NITUs that gave proper notice right? Whereas this one involved no public notice whatsoever. There was no public notice whatsoever of this. Not even a newspaper publication right? I understand the government alleged somewhere in its brief, well normally things are published. They didn't say this one was and there was no evidence of any publication of any kind related to this NITU. Absolutely correct Your Honor. And you have affidavits that say we didn't know. It's not even just a case of you know constructive notice. You have actual we didn't know affidavits from all the And the railroad operated until 2005 right? Correct. So if a owner were to have walked out their back door, which they did, they would have had no knowledge of the physical condition. That's absolutely correct. There's no basis. The question that I would ask my clients is what could they or should they have done to have informed themselves that they possessed this claim? And the answer is there's nothing that they could have done. The only, the manner in which the NITU, the 1998 NITU came into existence was in this private abandonment procedure. Now are you arguing that we should overturn Caldwell and Barclay and say the NITU is not the proper accrual point? Not at all Your Honor. I think the court has certainly, this panel has found that the court in Bonk has spoken on this issue. The Caldwell and Barclay are the law. Well I shouldn't say, refuse to hear it, we hear it in Bonk. So Caldwell and Barclay are the law and the law that would be Section 2501 or Principles of Due Process, that the limitations period cannot begin running before the owner has notice or reason to know of the NITU's issuance. Didn't the STB publish a notice in the Federal Register that the railroad had been authorized to abandon the line leading to the constructive notice, the public notice that was about to happen? Three responses to that Your Honor. First, there was a notice in the Federal Register in 1996 I believe, which the railroad published, which if anybody read it would have said the railroad was abandoning this corridor, not that they were trying to convert it to any future use. One would have to then know that these ranchers in Arizona must then know the whole STB process, but if they continued reading the Federal Register every single day they would have never come across the NITU because it was never issued there. It was just a filing in this private proceeding between the railroad and the STB. It said there might be an NTIU didn't it? It didn't say there might be an NITU in the Federal Register notice. What it did say is that there could be other proceedings affecting it. So I don't think that there's any way... I want to make sure I'm talking about the same one though because I'm looking at one in my hands right now. Is it the one from Friday, February 14th of 1997? That's the only one I've found. That is the only one. Valentine's Day publication, which is the only one we know of where the government has alleged. Really just two sentences, the summary does. Is that it? Is that all there is to this? That is all there is to that, Your Honor. It says the board exempts the railroad from prior approval requirements to abandon. It doesn't even say the railroad is going to abandon, it just says if you later down the road choose to abandon, you're exempt from prior approval requirements. Correct. That's the only published notice. You're absolutely correct, Your Honor. And the final point in the response is we would say when an order of a government agency is taking the owner's property, the Supreme Court's jurisprudence requires actual notice or attempted actual notice. You don't need to fight that battle. Do you really want to fight that battle? I don't think I do. I don't know that I need to, but I make that point because it is one where in this case it goes to the fact. I think the case can most easily be decided under the accrual suspension rule, under Section 2501, simply saying narrowly on the facts of this case there is no way that this was knowable to these owners in order to let them be informed of a fact but giving rise to a cause of action. What about the 1911 deed with respect to the other property? Yes, the deed itself is from the Cummings and it was to the original railroad, the El Paso. And under Arizona law, Arizona, like other states, you read the two cases, which interestingly Judge Hodges failed to mention in his decision, which are Boyd and Leisure, both have Arizona looking at railroad rights of way, strips of land for a railroad as being an easement as opposed to a conveyance of fee. But when we look at the language in this instrument, when we look at what the grantor said, he said over, through, across and upon a strip of land for relocation of a railroad line. So it was clearly defined both in the words of the document and the context in which it was issued. But he also says in fee simple. That doesn't have a very clear legal meaning. Well, I think fee simple, as we point out in the briefing referring to Professor Ely, is that that term can't be taken in particularly at the time of 1911, that the word fee was often used to determine the tenor, to describe the term of the estate company. Well, it's interesting you mention that point, Your Honor, because that's what the Arizona Supreme Court considered in the 1888 Boyd case, where they were trying to determine the tenor. They were describing what is the unique nature of an interest that a railroad holds in the land upon which it operates as rail line. And the Arizona Supreme Court in Boyd looked exactly at that and said it's something a little more, because these railroad interests are a more encompassing interest. It's not as though a private transaction, as the Court's familiar with the Purseau decision, Judge Plager's majority, talked about they're issued in the context of a flavor of condemnation or potential eminent domain. Isn't there more language than fee simple? Does bargain sell, grant, convoy, alien, et cetera? Pretty wholesome language. And that would be the language you would find in quick claim deeds or easements or indentures of the day. I mean, that is basically boilerplate form language that you can find in many instruments that are construed properly to be an easement. And I think, you know, we have to, the only way to read this is an actual conveyance saying that the grant were comings intended to convey to the railroad. And a fee simple deed isn't going to talk about over, across, and through, is it? Correct. It wouldn't. It's gone. So you don't talk about over, across, through stuff if it's a fee simple. They're trying to get somewhere less than a fee simple and more than an easement so they can keep the cattle off the railroad. Correct. And that was, the only interest the railroad needed in this transaction was to acquire an easement across it to operate a railroad line. And I think, again, we look at this court's decision in Perceau, we look at the Boyd case in Arizona, and I don't see that Arizona would have law different from what this court found to be the presumptions of Vermont law in Perceau. And I will reserve the balance of my time for it. Mr. Gray. May it please the court, my name is Michael Gray, here on behalf of the United States. The trains were running up and down these lines until 2005, and yet you're saying at that point the statute of limitations had already expired. How can that be right? Well, indeed in Barclay this court said just that, that it did not matter, the statute of limitations commences and it did not matter that in that case the trains, the railroad was still operating. So this court has in fact said it. How can that be noticed that the line's abandoned when they're running trains on it until after the time you'd have a chance to even raise a claim? I think it'd be helpful in answering that to just back up and describe the process here and what actually happens, because what happened in this case is actually not any different than what happens in the normal case where NITU is issued. And the way the process… Sounds to me like you're going to argue NITU's the wrong thing to satisfy a new or should have known accrual standard then, isn't it? No, I'm going to argue that you cannot rule for the plaintiff in this case without completely eviscerating the rule announced in Caldwell and Barclay, which we are bound by. I know Barclay had pretty clear public notice there. There were at least newspapers, which isn't here. I don't believe that's correct, Your Honor. There was no allegation in Caldwell or Barclay that they didn't have notice. Here we have affidavits from them saying we have no notice. That was not disputed in Caldwell or Barclay. Again, I think it's helpful to back up. It wasn't disputed in Caldwell or Barclay. That particular point was not disputed, but the facts of this case are the issuance of the NITU happens in the exact same way that it happened in Caldwell and Barclay. But there they didn't argue, they didn't know. Here they didn't know. And for a patient, you've got to have actual or constructive knowledge. So where is the constructive knowledge of this NITU? I'm looking at this document that Judge Moore has talked about a couple of times. Where in this do I get notice if I'm a landowner? If you're a landowner, you have a couple of things. You have a railroad running through your property. I do. Which you are on notice of, correct? The train is still running there until 2004. But it's incumbent upon you when you have a railroad running through your property that the corridor is governed by the Surface Transportation Board to pay attention to what's happening with the railroad. Okay, I'm paying attention. Where does this give me notice? The Federal Register, the railroad files, the SCB then says a notice of exemption from the abandonment proceedings, which specifically says that the notice is, and I'm quoting from the Federal Register notice here, subject to historic preservation, trail use, public use, and standard labor protective conditions and that additional requests for interim trail use, rail banking, under the railroad trail statute must be filed by a particular date. So if you are a landowner who has a railroad running through your property and you are paying attention, you know that there's an abandonment that might happen. You're interested in the land reverting to you. So you're paying attention to know that in the Federal Register they said this proceeding has started. However, at that point you can sign up with the Surface Transportation Board in the notice. In that notice they describe the rail operator, the county through which it runs, the terminus points that are proposed to be abandoned. They provide the names and addresses of who to call for further information. And at that point you can contact the SCB and ask to be put on the service list. Then as the proceeding goes forward, if a notice of interim trail use is issued and you are on the service list, then you will have notice. Now this document could lead to continued use of the rail line, right? They may decide not to abandon it. It could. And so I see the trains running by until 2005. I conclude... You conclude... You conclude it wasn't abandoned. The trains are still running. Again, the court rejected that explicitly in Barclay. I don't think so. That's where I'm... I don't read Barclay as expansively as you do. The language in Barclay was that Barclay says explicitly it does not matter that in that case that the railroad continued operating. That the date the notice of interim trail use is issued is what matters. Well, because there was no dispute that the landowners in that case had noted. So you're right, it didn't matter that the trains continued to operate because that wasn't the trigger for giving them notice. That wasn't a dispute. Let me back up here. The standard that you're applying, if the taking a cruise, it happens in a cruise, on the date the notice of interim trail use is issued, which they don't contest and which Caldwell and Barclay clearly hold that that happens, then the standard is, was the notice of interim trail use concealed or inherently unknowable for a cruel suspension? This notice of interim trail use was issued in the exact same way that they all are. If you say it's inherently unknowable, you've gutted the rule. You've gutted Caldwell, you've gutted Barclay. Because if it's inherently unknowable, then it's... And what is unjust about that? Because then we would have the government issuing newspaper notices as they should. Well, I don't know that you can require that. What you would have is plainness. You would have the CSC having to examine every single case. We can require that they give notice in a way that is publicly ascertainable. In Barclay and in Ladd, this court clearly expressed a preference for a bright-line rule because of the problems you would have with so many landowners, with so many interests. I mean, here you have some with fee-simple interests, some without, some that may have a reversionary interest. All along, for each of my hundreds or thousands of landowners, you're talking about a rule that says you have to ascertain whether each individual potential plaintiff was... when they knew about it. And that completely guts the rule from Caldwell and Barclay. No, it can't. That's the rule. The rule you have to construct over actual notice. We're not making this stuff up as we go along. I mean, these are the Supreme Court dictates on when a claim can accrue. I think that the only way that you can read Caldwell and Barclay is that because the notice of interim trail use happens as part of a public process, that that is sufficient for constructive notice. And it's sufficient in all cases for constructive notice. Because if it's not, then you can't say that the notice of interim trail use starts it. In the previous appeal in this case... But then, because the litigants in Barclay and Caldwell were on top of it and aware of those things. No, they weren't, because they were... Those cases were dismissed for failure to comply with statute of limitations. By the way, the newspaper is required by regulation, right? The newspaper... It's a newspaper notice of the abandonment... So you violated your own record. We don't have in the record evidence of the newspaper notice. There certainly hasn't been... So you violated your reg. The reg doesn't require us to... The reg requires notice in the newspaper. It doesn't require that we manage to make it in the record in this case. They certainly haven't proven that no notice was given. Hello? You didn't even allege that there was, in fact, a newspaper publication in this instance. Forget about whether it's in the record. You didn't even make that allegation in this case. Caldwell and Barclay adopted such a bright-line rule that I don't think anybody thought it was going to be necessary to go back and search the newspaper records from 1997 to see if the railroad published a notice. The regulation requires... And let's be clear, the notice is not of the interim... You've got this thing called the Internet now. You can plug it in and it finds it in about 20 seconds. You're making this sound a little more difficult than it probably is. I'm not sure if that's... I'm not sure how well the Internet records go back for newspaper publications in Arizona in the mid-'90s. But that's beside the point. Let's keep in mind that the newspaper notice that we're talking about is the same notice that's published in the Federal Register. It's of the commencement of the abandonment proceeding. It's not of the Notice of Interim Trail Use. There is not a newspaper publication required by the reg for the Notice of Interim Trail Use itself in any case. So the Federal Register notice was sufficient, regardless of whether there was newspaper notice, to put the plaintiff on notice that the proceeding was going forward. That is enough to make it not inherently unknowable. That's the standard. Is it inherently unknowable? That's this Court's articulation of the standard in the Ingram case, which in footnote 1 this Court says is the same standard. They don't mean to be stating a different standard from new or should have known. If this Court decides that the normal route of publication of a Notice of Interim Trail Use, which is publication of the proceeding in the Federal Register, then issuance without actual notice, if the Court decides that is inherently unknowable, then again, we believe that completely guts the rule from Caldwell and Barclay. How, in your mind, they would have to find out about the issuance of the NITU, the day it issued? What would individual landowners have to do? And what, in your view, is it that they should have done to be on notice? What they would need to do is keep abreast of the SQP proceedings that go on with their – I mean, one way to do it is to stay in contact with the railroad. You know you have a railroad. You can stay in contact with the railroad and say, what should we be doing? Once they know about the Federal Register notice – Slow down. Let me get some words in here. So when they have to stay in contact with the railroad, do you envision weekly, monthly, yearly? What is your view of the obligation on the landowner to apprise itself when the government issues this NITU, which it doesn't publish anywhere and which isn't distributed to anybody? They have a six-year limitations period. They need to apprise themselves at least every six years to make sure that they are within their limitations period. And it is not uncommon to require landowners to remain abreast of what's going on on their property. An affirmative obligation on a landowner to make sure that it knows  And so what they should be doing – And certainly not when there's already been an easement and they continue to operate the trains every day. We have lots of cases. I've been on many of them. It says the landowner should apprise itself. How did you not notice the government drove a giant backhoe onto your land and dug out half of it? Well, there hadn't been an easement there, you see. Well, but I think when there's a railroad going, then that puts you on – There's small oil in Barclay, isn't there? There's instances of the government bombing the land or taking filth from it. This is considerably different, isn't it? I don't think it is. In principle, I mean, there's also – It's akin to if a municipality were to pass a regulation that says you can have no development of this property at all and doesn't provide any actual notice and the statute of limitations period has run, you would say it's incumbent on the landowner to pay attention to the regulations that affect this property. This is not a different situation. I think we're entitled to an opportunity to deal with that issue as well. I do. Our view on that issue is that in fee simple means in fee simple. It says it's conveyed in fee simple. In fee simple, all of the property or something. Why do we have a cross and over and through and upon and all these limitations that are easement language? I think that right of way is an easement language. I don't think that those are easement languages. I think it's describing a strip of land, and I think it's describing it as this is a strip of land that we're giving up as part of the parcel that goes through our parcel. It's a strip of land in fee simple that we're conveying, and I think that's sufficient. If using the words in fee simple in a state where even without it, the presumption is you give a fee grant isn't enough, I'm not sure what they would have said to grant a fee simple interest here. I do want to go back, though, and just make clear, again, because I'm not sure I got to completely address Judge Moore's question about what we expect them to do. Again, when the Federal Register notice is issued, which this court has said publication of the Federal Register is sufficient notice on interested parties, no matter any injustice that results. When that notice is issued, all they have to do is come and ask to be put on the service list with the STB. When a need-to is issued as part of the process, they will receive notice of it. That is not much to ask a landowner that has a railroad running through his property. Therefore, we ask that this court confirm. Thank you, Mr. Gray, and thank you for responding to many questions.  Mr. Herman. Thank you, Your Honor. What the government is asking this court to do and what they ask Judge Hodges to do is to impose on these Arizona ranchers a standard of basically omniscience that the Justice Department themselves, the STB themselves, as I mentioned, 10 different Department of Justice lawyers, two different assistant attorney generals, two different general counsels from the Service Transportation Board, and an affirmative declaration from one of the commissioners. But, Mr. Herman, I think you really need to deal with the key point from what Mr. Gray told us, and that is if we depart from this bright-line NICU rule, don't we have to then start analyzing each individual landowner independently for when they knew or should have known with different facts and the complexities of administrative complexity, that would mean? Sure. Two answers, Your Honor. First off, on the facts of this case, the court is certainly able to rule on the facts of this case following settled principles under the accrual suspension rule that these owners did not have, this was inherently unknowable to these owners based on these facts. That would be a very limited ruling that would apply to these owners. The broader point is that maybe this will come up in other Trails Act cases because, for whatever reason, the Service Transportation Board has chosen, which they can, to not require either themselves or the railroad to ever directly inform an owner when an NICU is issued. But that's a situation entirely of the government's making. Under the Constitution, this is the taking of these people's property. It's had a tremendous effect on these Arizona owners. They would have brought an action had they known about this, and they couldn't have. They didn't have, unlike other cases, the knowledge that perhaps General Caldwell did in that case where there was discussions about when the deed was recorded and there was some knowledge. So I think in those cases, to answer your question, Your Honor, in those cases where an owner such as this does not ever have a reason to know or have a reasonable knowledge of the issuance of an NICU, you could have another case where the accrual suspension rule or principles of due process could delay the beginning of the running of the limitation period until such time as the owner did have knowledge. But we don't dispute the Bright Line rule at all in Caldwell and Barclay. That is the rule. That is when the claim accrued. That's what this Court has held, and it makes sense because that order did have the effect of depriving them of the unencumbered possession of their property. Now, the fact that it wasn't implemented, they didn't have knowledge of it, doesn't change that fact. But couldn't your clients have simply gone down to the STB and put themselves on some sort of notice list and thereby forever, whenever a NICU is issued, they would have gotten a copy of it? Well, no. The government makes it sound as though all they had to do, they would have had to read, even under the government's supposition, they would have had to have been reading the Federal Register every day. Hold on now. If a NICU had issued in the Federal Register for the whole world to see, would you still be arguing they didn't have constructive knowledge? I'm sorry. Are you hypothesizing that, in fact, they did publish a NICU? Well, if a NICU had been published in the Federal Register, are you saying that would not have been adequate to put them on constructive notice? There certainly would be a much better argument that they were on constructive notice. As we've made clear in our briefing, we think that publication doesn't satisfy the constitutional standard under the Mullane and New York Central cases and Mennonite. When the government agency orders taking the property. But I don't, as you mentioned, Your Honor, I don't know that we need to go to that point. In this case, there was not even a basis for constructive notice. So what would they have had to do to put themselves on the notification list? Well, I think, at minimum, they should have mailed a notice to the property owners. If they didn't do that, they could have published it in the newspaper in that community so that owners in that community could have read it and they would have had a publication that the owners have a claim. Much as required in the opt-in class action procedures in these Trails Act cases, the Court of Claims routinely requires publish a notice in the local newspaper. It costs a couple hundred, a couple thousand bucks. You publish it a couple times, everybody knows what's going on. And if they have a claim and the ability to participate or not. That wasn't done here. And these people had no ability to protect their rights because they didn't have the knowledge of the basic facts necessary to do so. Thank you, Your Honor. Thank you, Mr. Vernon. That concludes our meeting. All rise.